DAVIDOFF MALITO & HUTCHER LLP
605 Third Avenue, 34th Floor
New York, New York 10158
Telephone: (212) 557-7200
David Wander, Esq. (dhw@dmlegal.com)
*Attorneys for Debtor and Debtor in Possession*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
In re:                                                          Chapter 11

SHELDRAKE LOFTS LLC,                                            Case No. 10-23650 (RDD)

        Debtor and Debtor in Possession.
----------------------------------------------------------------X

### DEBTOR'S EMERGENCY MOTION FOR ORDER (I) AUTHORIZING USE OF CASH COLLATERAL; (II) APPROVING INSURANCE PREMIUM FINANCE AGREEMENT; AND (III) GRANTING RELATED RELIEF

TO:    THE HONORABLE ROBERT D. DRAIN,
         UNITED STATES BANKRUPTCY JUDGE

Sheldrake Lofts LLC (the "**Debtor**"), debtor and debtor in possession, by its attorneys, Davidoff Malito & Hutcher LLP, submits emergency motion for an order (i) authorizing the use of cash collateral, (ii) approving an insurance premium finance agreement, and (iii) granting related relief, and respectfully represents and says as follows:

### Preliminary Statement

1.    <u>Use of Cash Collateral.</u> The Debtor seeks the use of cash collateral, primarily rent income, to maintain and enhance its real properties and improvements in Mamaroneck, New York. As discussed in detail in the accompanying Declaration by Ofer Attia (**"Attia Declaration"**), the Debtor's principal, the funds will be used for maintaining the properties and making necessary repairs. Additionally, the funds will go towards the management, marketing and development of the properties, which will significantly and quickly increase the Debtor's

00410023.5

gross rents and net income. Some of the increased net income will also be used to fund the Debtor's litigation against the Village of Mamaroneck.

2. <u>Adequate Protection.</u> The Debtor will provide adequate protection to Remediation Capital Funding, Inc. ("**RCF**"), its secured lender, for this use of cash collateral in the form of a (i) replacement lien on rents, and (ii) a super-priority administrative claim for any diminution in the value of RCF's collateral.

3. <u>Extraordinary Provisions</u>. The Debtor does not believe there are any extraordinary provisions that require prominent disclosure, in accordance with General Order No. M-274.

4. <u>Debtor's Proposed Budget.</u> The Debtor's proposed budget is annexed as **Exhibit A** hereto and is also annexed as an exhibit in the Attia Declaration.

## Emergency Relief

5. The Debtor seeks emergency relief for financing, in the sum of $6,218, for the payment due by Monday, September 20, 2010, under the Debtor's proposed insurance premium financing agreement with Aon Premium Finance, LLC (**"APF"**) for property and liability insurance (**Exhibit B**).[1] **Earlier today, the Debtor received the consent of RCF to use its**

---

[1] The total cost is $13,958.00, and the amount financed is $9,073.17, payable in seven (7) consecutive monthly payments of $1,333.71, with the first installment payment due September 20, 2010. There also is down payment of $4,884.83 due by September 20th, for a total of $6,217.94 due by September 20th. As collateral to secure the repayment of the indebtedness due under the Premium Financing Agreement, APF will receive a first priority lien in the policies, including (ii) all money that is or may become due under the Premium Financing Agreement because of a loss under the policies that reduces unearned premiums (subject to the interest of any applicable mortgagee or loss payee); , and (ii) any return of premiums or unearned premiums under the policies; and (iii) any dividends that may become due the Debtors in connection with the policies. As set forth in the accompanying affirmation by David Wander, Esq., the Debtor has no unencumbered assets and no ability to obtain credit unencumbered by super-priority status; the Premium Financing Agreement is necessary to preserve assets of the estate; and the terms of the agreement are fair, reasonable and adequate. The agreement is believed to be a standard, type of agreement for this type of transaction and which is often approved by the Court in this district.

**cash collateral to make this payment.**[2] If this payment is not made by September 20th, the Debtor's estate may suffer immediate and irreparable harm by having its properties uninsured, as set forth in the accompanying Affirmation by David Wander, Esq. dated September 16, 2010 **(Exhibit C)**.

6. The Debtor also seeks the entry of a proposed Interim Order approving the insurance premium finance agreement **(Exhibit D)**.

7. As set forth in the Wander Affirmation, shortly after the commencement of this case, the Debtor provided the U.S. Trustee's Office and counsel for RCF with copies of the proposed insurance and financing. Since then, the Debtor has been diligently working with counsel for RCF and Aon to resolve various issues raised by RCF, as well as requests by RCF for more information about various aspects of the insurance coverage and financing. RCF is now satisfied to the point where it consents to this relief.

8. Accordingly, pending a preliminary hearing to consider an interim order, the Debtor requests that the Court consider this emergency request for financing and use of cash collateral.

## Background

*The Bankruptcy Case*

9. On August 10, 2010 (**"Filing Date"**), the Debtor filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (as amended, the **"Bankruptcy Code"**). Shortly thereafter, the Debtor filed its schedules of assets and liabilities (together with the chapter 11 petition, the **"Petition"**), statement of financial affairs and other required lists and schedules.

---

[2] RCF's consent is without prejudice to RCF's rights (i) to oppose all other use of its cash collateral, and (ii) all other rights and remedies it may have in this case.

10. The Debtor has been authorized to continue to operate its business and manage its property as a debtor in possession, pursuant to §§ 1107 and 1108 of the Bankruptcy Code.

11. A creditors' committee has not yet been formed in this case. No trustee or examiner has been appointed.

*Debtor's Assets and Liabilities*

12. The Debtor owns several contiguous parcels of real property in the Village of Mamaroneck (**"Village"**) situated along the Sheldrake River: 270 Waverly Avenue (**"270 Waverly"**), 206-208 Waverly Avenue (**"206 Waverly"**), 188 Waverly Avenue (**"188 Waverly"** and 147 Plaza Avenue (**"147 Plaza"**) (collectively the **"Property"**).[3] The Petition lists the current fair market value of the Property as $3,000,000; however, as set forth in Schedule A of the Petition, the value will increase to $15,000,000 if the Debtor obtains a building permit.[4]

13. The Debtor has significant claims against the Village, estimated at $40,000,000 in Schedule B of the Petition, based upon the Village's failure to issue a building permit to the Debtor (discussed below in detail). The Debtor also listed claims in Schedule B, in an unknown amount, against RCF and Cozen & O'Connor (**"Cozen Firm"**), a law firm RCF had the Debtor retain to prosecute its litigation against the Village.[5] Additionally, the Debtor's assets include a $240,000 claim against the Village for the return of a "recreation fee" that the Debtor was

---

[3] The Property is designated as Block 823, Lots 389.2, 289.1, 229, 280, 285 and 285.2.

[4] The Property was appraised in its "As Is" condition, as of July 18, 2008, at $19,000,000.

[5] The Debtor is now preparing a complaint for damages against the Village, RCF and the Cozen Firm. Among other things, the Debtor will seek to avoid RCF's liens and subordinate its claim, under § 510 of the Bankruptcy Code.

required to pay before the Village would review the Debtor's application for a building permit. The recreation fee was to remain in escrow pending issuance of the permit.[6]

14. The Debtor's liabilities include RCF's presently undersecured claim estimated at $12,000,000, excluding any offsets or defenses. The Debtor also owes real property taxes in an undetermined amount, as set forth in Schedule E of the Petition. In addition, the Debtor listed ten (10) unsecured creditors with claims totaling in excess of $1.8 million in Schedule F of the Petition.[7]

### *Debtor's Pre-Petition Lending Arrangement with RCF*

15. The Debtor entered into a Loan Agreement dated March 2, 2007 with RCF, pursuant to which RCF agreed to loan up to $6,635,000 in total principal payments to or for the benefit of the Debtor. The loan was for eighteen (18) months and matured on September 1, 2008. The interest rate was 14% for the first six months and 18% for the next twelve months, with the default rate at 24.5%. The loan also included an exit fee of $132,700. The Debtor also executed a Note dated March 2, 2007, in favor of RCF, in the sum of $6,635,000.

16. Simultaneously with the execution of the RCF loan, the Debtor intended to purchase three parcels comprising the Property: 270 Waverly, 206 Waverly and 188 Waverly (collectively **"Acquisition Properties"**). At that time, the Debtor already owned 147 Plaza. The RCF loan was for the Debtor's purchase of the Acquisition Properties, a refinancing of an existing mortgage encumbering 147 Plaza, and certain improvements to the Property in order to redevelop the site as a luxury condominium development.

---

[6] The Debtor recently made demand upon the Village for the return of the $240,000 recreation fee plus interest. Upon receipt, the Debtor will deposit these funds in a DIP account pending further order of the Court. If the Village issues the Debtor a proper building permit, the Debtor will pay the recreation fee, if required.

[7] One creditor listed on Schedule F, with a claim of $45,000, filed a mechanic's lien against the Property, prior to the Filing Date and, as a result, the Debtor may reschedule this claim on an amended Schedule D of the Petition.

00410023.5         5

17. The RCF loan was intended to provide the Debtor with bridge financing until it received a building permit and closed on its construction financing, a $33,600,000 construction loan from Corus Bank in Chicago, Illinois.

18. To secure the RCF loan, the Debtor executed a Mortgage, Security Agreement and Assignment of Leases and Rents dated March 2, 2007 (**"Mortgage"**).[8] Upon information and belief, the Mortgage was duly recorded in the Office of the Westchester County Clerk's Office. Pursuant to the Mortgage, the Debtor provided RCF with a first mortgage lien on the Property, an assignment of rents, and a lien on other assets of the Debtor. In addition, the loan was secured by the personal guaranty of Mr. Attia.[9]

*Prior Use of the Property for the Blood Brothers Auto Wrecking Business*

19. For many years, Blood Brothers Auto Wreckers, Inc. (**"Blood Brothers"**) conducted an auto wrecking business at the Property, specifically 270 Waverly and 147 East Plaza. Not only an eye sore, the car crushing business was a toxic waste dump that polluted the groundwater and air with gasoline fumes, which also engulfed nearby homes.

20. The auto wrecking business also included a junk yard for abandoned cars, which attracted homeless strangers seeking shelter. This made the residential neighbors fearful to let their children outside to play in their own backyards.

*Debtor's "Sheldrake Estates" Condominium Project*

21. Mr. Attia proposed replacing the auto wrecking business with a 114 unit luxury condominium development called "Sheldrake Estates." He hired various professionals, including architects and engineers, to design the project with three main buildings, each

---

[8] Copies of the RCF Loan Agreement, Note and Mortgage are annexed to the Attia Declaration.

[9] On October 12, 2009, Mr. Attia filed a voluntary petition for relief under Chapter 7 of the Bankruptcy Code with the U.S. Bankruptcy Court for the S.D.N.Y., Case No 09-23904 (RDD). Mr. Attia received a discharge of all debts and, on July 28, 2010, an Order of Final Decree was entered closing the case and discharging the chapter 7 trustee.

containing 36 residential units, with surface grade parking, three full floors and an attic loft (**"Project"**). The Project also included two buildings containing six townhouse style units. Sheldrake Estates would have extensive landscaping and a walk-way along the Sheldrake River.

22. Construction of the Project would also include remediation of certain environmental problems at the Blood Brothers' site, including two toxic waste spills. Additionally, Sheldrake Estates would create an area of transition for the neighborhood, between manufacturing, commercial and transportation uses and lower-density residential uses. It would also create needed housing that was within walking distance to the Village train station. Additionally, the Village would benefit from the increased tax revenues.

23. The community was largely enthusiastic about the Project, especially the nearby residents on Waverly Avenue, 17 of whom signed a petition in support of Project. However, a small but vocal and politically connected group of individuals were determined to stop the Project and it is believed they conspired to prevent the Debtor from obtaining a building permit. Certain of these individuals had a political agenda and the Project became embroiled in the ongoing disputes between the local Republican and Democrat parties. Other individuals, upon information and belief, were intent on stopping any new construction in the Village.

*Village Board Approves Rezoning of the Property*

24. For the Project to proceed, the Property had to be rezoned from mixed use (M-1) to high density residential use (RM-3). Accordingly, in 2004, an application was filed with the Village Board of Trustees (**"Board"**) seeking approval of the Debtor's proposed rezoning. On August 28, 2006, after a lengthy environmental review process, a public review period and

extensive discussion and analysis, the Board approved the rezoning of the Property, and issued very detailed findings highly praising the Project.[10]

*Village Planning Board Gives Final Site Approval; Debtor Remediates the Property*

25. On July 31, 2007, the Debtor received final approval for its site plan from the Village Planning Board, subject to comments from the Village Fire Council. On November 20, 2007, the Debtor filed a revised site plan to the Fire Council's comments, as well as additional comments by the Village Director of Buildings. By this time the Debtor had spent millions of dollars assembling the various parcels, getting rid of the Blood Brothers business and remediating the site.

26. On December 17, 2007, at a meeting of the Village Planning Board, the Debtor received final site plan approval; however, the Planning Board reduced the Project to 96 units, including 6 affordable housing units. The December 17th meeting, which was open to the public, was quite controversial, due to the recent November elections that resulted in a new mayor and a shift in control of the Village Board from the Republicans to the Democrats, who ran on a platform emphasizing limited growth in the Village. The Project was approved only after Mr.

---

[10] The Board found, among other things:

> The proposed rezoning and residential development would be compatible with the surrounding mixture of land uses in the neighborhood and would enhance the current conditions of the project parcel. The compatibility and connectivity with existing land uses in the vicinity of the project site would be further strengthened through location of the site, since the site is within walking distance of the Mamaroneck Avenue business district, Columbus Park and the train station. A landscaped residential use of the site would only enhance local residential land uses and property values compared to the prior use or another industrial or manufacturing use.

Findings Statement Attachment, p. 3. The Board also found:

> The Sheldrake Estates development would result in the conversion of a manufacturing land and an automotive junkyard to a residential development. The increased market value of the proposed site, with these improvements, would result in an increase in property tax revenues.

Findings Statement Attachment, p.10. Significantly, "[n]o variances from the Zoning Code will be required for the project." Findings Statement Attachment, p. 3-4.

Attia made an impassioned presentation, reminding everyone how he had rid the Village of the Blood Brothers' car wrecking business, spent significant sums to remediate the site, and accommodated all reasonable and economically feasible requests for design changes to the Project.

***Conspiracy to Prevent Debtor from Obtaining a Building Permit***

27. After the Planning Board's approval, it was generally recognized that the Debtor merely had to file the necessary application for a building permit by December 31, 2007, along with the site plan and full constructions drawings, and pay the Village a $240,000 "recreation fee" (**"Recreation Fee"**) for the building permit to be issued.[11] On December 27, 2007, the Debtor filed its application for a building permit (**"Building Permit Application"**), along with the site plan and complete construction drawings. The Debtor also paid the Recreation Fee and, upon information and belief, Mr. Galvin then signed the Debtor's site plan and construction drawings.

28. However, it is believed that some of the local politicians and other politically connected people in the Village left the December 17th Planning Board meeting vowing to stop the Project.

***Village Director of Buildings Fails to Review Debtor's Building Permit Within a Reasonable Time***

29. Under applicable law, the Director of Buildings was required to approve or disapprove the Building Permit Application within a "reasonable" amount of time. *§ 126-12 of the Villages Local Laws*. The law provides:

> The Director of Building, Code Enforcement and Land Use Administration shall examine or cause to be examined all

---

[11] The "recreation fee" was a new Village law designed to raise additional revenue from new construction and was passed with the Debtor's project, specifically, in mind. The Planning Board Chairman, Robert Galvin would not sign the Debtor's site plan and construction drawings until the fee was paid

> applications for permits and the plans, specifications and documents filed therewith. He shall approve or disapprove the application within a **reasonable** time.

§ 126-12 of the Villages Local Laws [emphasis added].

30. For many months, the Debtor's representatives were repeatedly assured by the Village that the Debtor's construction drawings were being reviewed and that the Building Permit Application was being processed. However, more than five months passed without any such action.

*Village Enacts Local Law No. 5-2008*

31. Meanwhile, the former Mayor and certain Village trustees were aggressively promoting a new law which would amend the floor area ratio (FAR) for new and expanded buildings and clarify the manner in which FAR would be calculated in the Village. They passed Local Law No. 5-2008 **("New Law")**, amending Chapter 342 of the Village Code, regarding FAR and its calculation. Under the New Law, the allowable FAR for RM-3 Multiple Residences was reduced from 1.6 to 1.2.

*Mr. Attia Finds the Debtor's Construction Plans Gathering Dust at the Buildings Department*

32. By June, 2008, Mr. Attia was becoming increasingly frustrated because the Building Permit Application still had not been approved and he was anxious to begin construction. Finally, on June 10, 2008, Mr. Attia went to see the Village Buildings Inspector, John Winter, at the Buildings Department and found the Debtor's construction drawings sitting on top of a filing cabinet. It was obvious they were not being reviewed. When Mr. Attia asked Mr. Winter what could be done to expedite the matter, he was told to overnight the construction drawings to Noel Shaw, the Village's reviewing and consulting engineer, who was supposed to review them. Mr. Attia immediately sent the construction drawings to Mr. Shaw. On or about

July 22, 2008, Mr. Shaw approved the construction drawings and full construction approvals were then granted.

*Village Attorney Instructs Mr. Winter to Apply the New Law to the
Project as Restrictively as Possible*

33. Upon information and belief, the Village Attorney then instructed Mr. Winter to stop the Project by applying the New Law in the most restrictive manner possible.[12] Accordingly, on or about July 24, 2008, Mr. Winter sent a letter to one of the Debtor's representatives, Peter Hart, stating that the New Law applies to the Project and asking him to recalculate its FAR.

34. On November 12, 2008, more than eleven (11) months after the Building Permit Application was first filed, Mr. Winter finally acted on the Building Permit Application and issued a formal Notice of Disapproval.

*Village Zoning Board of Appeals Denies Debtor's Appeal and
Application for a Variance; Debtor's Article 78 Proceedings*

35. On or about January 20, 2009, the Debtor filed an application with the Village Zoning Board of Appeals (**"ZBA"**), seeking an interpretation that the New Law did not apply to the Project and, alternatively, if the New Law did apply, the Debtor requested a variance, permitting a proposed FAR of 1.6 instead of the maximum allowed is 1.2. On April 2, 2009, the ZBA denied the Debtor's request for a variance.

36. Thereafter, the Debtor commenced several Article 78 proceedings against the Village, in the Supreme Court of the State of New York, Westchester County, two of which are currently pending.[13]

---

[12] Standing alone, would not have stopped the Project because it had a documented FAR of 1.2. However, Mr. Winter took the position that the calculations of FAR, under the New Law, would include the Debtor's parking facilities. The new calculation increased the Project's FAR to 1.6, one-third over the allowable amount and required the Debtor to obtain a variance from the Village Code.

[13] The Debtor is now in the process of removing the Article 78 proceedings to the U.S. District Court which will, presumably, then transfer the litigation to this Court.

## RCF Improperly Takes Control Over the Article 78 Proceedings and Settlement Negotiations

37. In December 2009, RCF expressed its displeasure with the attorney representing the Debtor in the Article 78 proceedings and suggested to Mr. Attia that the Debtor substitute the Cozen Firm, with whom several principals of RCF have had a long-term relationship, as Debtor's counsel in the litigation. In January 2010, the Cozen Firm was substituted as counsel for the Debtor and obtained the files from prior counsel.

38. As described in detail in the Attia Declaration at ¶¶ 36-39, for the next six months RCF and the Cozen Firm misled Mr. Attia into believing they were all working together in furtherance of the Debtor's claims in the Article 78 proceedings. Meanwhile, RCF and the Cozen Firm were secretly negotiating with the Village to have RCF take over the Project. In mid-July, Mr. Attia accidentally discovered what was going on. He found out that RCF and the Cozen Firm had a meeting scheduled with the Village for July 20, 2010. Mr. Attia tried contacting Mr. Roberts, without success, to find out was going on. The day before the meeting, a partner at the Cozen Firm, Kenneth Roberts, Esq., sent Mr. Attia an email atating: "There's a meeting tomorrow at which the Village will be discussing with the lender an amended site plan they may proceed with after foreclosure." Later that day, Mr. Roberts sent Mr. Attia another email notifying him that he was not invited to the meeting. Shortly thereafter, Mr. Roberts sent another email to Mr. Attia stating that the Cozen Firm would no longer be representing the Debtor.

39. Meanwhile, RCF had already proceeded to foreclose on the Property. On July 14, 2010, RCF gave notice that a foreclosure sale of the Property was scheduled for August 11, 2010.[14]

---

[14] RCF commenced its foreclosure action in 2007, in the Supreme Court of the State of New York, Westchester County, Index No. 25697/07.

## JURISDICTION

40. This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (M). Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

41. The statutory predicates for the relief requested §§ 105(a), 361, 363, 364 and 552 of the Bankruptcy Code.

## RELIEF REQUESTED

### A. Cash Collateral

42. The Debtor seeks to use cash collateral in which RCF has an interest, in the ordinary course of business, in accordance with the Debtor's proposed budget which is discussed in detail in the Attia Declaration. Notably, the Debtor has been unable to obtain the consent of RCF to the Debtor's proposed use of cash collateral, except for payment of insurance premiums.

43. In accordance with §363(e), if an entity who has an interest in property sought to be used by a debtor in possession does not consent to the debtor's use of such cash collateral, the court "shall condition or prohibit such use ...as is necessary to provide adequate protection of such interest. 11 U.S.C. § 363(e). Section 363(e) is intended to safeguard against any decrease in value attributable to the debtor's proposed use of the collateral. see In re Island Helicopter Corp., 63 B.R. 515, 520 (Bankr. E.D.N.Y. 1986). The burden of proving adequate protection rests with the Debtor. 11 U.S.C. § 363(o).

44. A secured creditor holding both a mortgage securing a debt on a parcel of real property and a perfected security interest in the rents from such property holds two distinct interests that "must be separately considered and, if necessary adequately protected." 499 Warren Street Associates, Ltd, 142 B.R. 53, 56 (Bankr. N.D. N.Y. 1992).

45. A secured creditor's interest in rental property is adequately protected when a portion of the rents are applied to its operation and maintenance. 499 Warren Street Assoc., 142 B.R. at 56. Applying rent income to maintain and repair the property "will enhance the value of the property which serves as the collateral for the mortgagee's claim" if the use of such funds prevents the property from deteriorating. Pine Lake Village Apartment Co., 16 B.R. 750, 756 Bankr. S.D.N.Y. 1982; see e.g., In re Willowood East Apartments of Indianapolis, 114 B.R. 138, 143-44 (Bankr. S.D.Ohio 1990) (using a portion of rent income for payment of the normal operating expenses associated with the property will preserve the value of the secured claim and provides adequate protection for that interest). Additionally, a secured creditor's interest in rental income generated by the property is adequately protected when a portion of the rents is reinvested in the property for operational expenses and maintenance, so as to generate additional rents upon which that creditor's security interest subsequently attaches. 499 Warren Street, 142 B.R. at 57. If there is a continuous income stream generated by the property, the fact that a portion of those monies is consumed by the debtor in possession each month, to operate and maintain the property, does not diminish the value of the creditor's interest in the collateral. See In re Megan-Racine Associates Inc., 202 B.R. 660, 663 (Bankr. N.D. N.Y. 1996). As long as creditor retains its security interest in the future income, it is adequately protected as long as the income does not decline. Id. at 663-664. In the present case, as shown by the projections included in the Debtor's budget and discussed below, there will be a continuous stream of net rental income from the Property that increases each month.

46. Allowable expenses the Debtor should be authorized to pay include: (i) payroll and normal and reasonable employee expenses, (ii) utilities, (iii) insurance, (iv) reasonable management and marketing fees, (v) ordinary and necessary repairs and maintenance, (vi)

ordinary advertising and marketing expenses, (vii) post-petition taxes and other government charges, (viii) reasonable bookkeeping and accounting fees, and (ix) other post petition charges which are necessary to conduct normal business operations. In re Cardinal Industries Inc., 118 B.R. 971, 981 (Bankr. S.D. Ohio 1990).

47. In the present case, cash flow from the property will be sufficient to pay current operating expenses and maintenance costs, with a surplus for deposit into a segregated DIP account, if necessary.[15] Additionally, there will be a significant increase in the future rental stream and this will, undoubtedly, increase the value of the Property. Moreover, the Property will be managed in a responsible and competent manner. The Property shows no sign of depreciating, unless necessary repairs are not made. In sum, there will be no decrease in value of collateral.

*The Debtor's Budget*

48. The Debtor's proposed budget (**"Budget"**) covers 6+ months, from the Filing Date through February 2011, and includes a summary of income, expenses, net income and accumulate net income (**"Summary"**); a detailed budget by line item, on a combined basis, including both residential and commercial properties (**"Combined Budget"**); a detailed budget for the residential properties, on a stand alone basis (**"Residential Budget"**), and a detailed budget for the commercial properties, on a stand alone basis (**"Commercial Budget"**).

49. The Budget shows a significant increase in monthly income, from $14,141 to $57,861. While rent income from the residential units is, basically, flat, the monthly rent income from the commercial properties will increase from $1,500 to more than $40,000. Net income

---

[15] The value of property securing a claim increases to the extent of unspent rental income accumulating in a segregated cash collateral account. In re Pine Lake Village Apartment Co., 19 B.R. 819, 826 (Bankr. S.D.N.Y. 1982).

increases from $0 to $35,000 a month. By February 2011, the Debtor will have accumulated over $100,000 in net income.

50. The Combined Budget includes, at the bottom, a line item for the projected recovery of the Recreation Fee from the Village and another line item showing the application of such funds to pay the local property taxes which are itemized on the Residential Budget and Commercial Budget for the respective properties. There also is a line item at the bottom of the Combined Budget for legal fees in an amount that is presently undetermined.[16] The Residential Budget and Commercial Budget each gives a snapshot of the income and expenses associates with these respective properties.

51. The Attia Declaration at ¶¶ 52-62 describes each line item of expense in detail.

### *Use of Cash Collateral and Adequate Protection*

52. <u>Emergency Budget.</u> The Debtor needs immediate funds of $6,218 for payment of necessary insurance. This amount represents the initial payment due by September 20, 2010.

53. <u>Interim Budget</u>. The interim budget will include the line items of expenses for the period August 10, 2010 – October 31, 2010. The Debtor projects that it will break even during this period.

54. <u>Final Budget.</u> The final budget presently covers November 1, 2010 – February 28, 2011. The Debtor will likely modify this budget, prior to a final hearing, taking into account

---

[16] It is anticipated that these legal fees will be incurred, primarily, in connection with the Debtor's prosecution of the Article 78 claims and an adversary proceeding against the Village for damages). Prior to a final hearing on this motion, the Debtor will file additional, supporting papers for this proposed use of cash collateral, under §552(b)'s equity exception. While, generally, if a creditor is undersecured, "the administrative expenses of a debtor's case are not to be charged against [its] collateral because a secured creditor's interest in collateral is a property right which is not impaired in bankruptcy proceedings," in an appropriate case, Code §552 gives the Court the discretion to allow a debtor in possession to pay its bankruptcy attorney's fees and expenses from encumbered assets In re 680 Fifth Avenue Associates, 154 B.R. 38, 43 (Bankr. S.D.N.Y. 1993) Brozman, J. ("... while I may choose not to exercise that discretion, the Code vests me with the authority to do that which the debtors have requested"). The Debtor submits that, if prosecution of the Debtor's Article 78 claims can result in the Debtor receiving a building permit, thereby significantly increasing the value of RCF's collateral – perhaps by more than $10,000,000 as indicated in the Petition, this Court may find that the equities exception will apply.

any changed circumstances in this case. As set forth above, the Debtor projects that it will have accumulated approximately $100,000 by the end of February 2011.

55. As adequate protection, the Debtor proposes to give RCF (i) a replacement lien on post-petition rents from the residential units; and (ii) a super-priority administrative expense for any diminution in the value of RFC's collateral during this case.

56. The relief requested is without prejudice to the rights of the Debtor, any creditors committee or any chapter 7 trustee to challenge the validity, priority or extent of any security interest or liens of RCF on property of the Debtor. The Debtor does not intend to make any waiver or concession as to any prepetition debt or the validity, enforceability, priority, or the amount of a claim that arose before the commencement of this case, or of any lien securing a claim, until the Debtor has had an opportunity to fully investigate all of the facts and circumstances relating to the financing presently in place.

57. The Debtor believes that the Budget will be adequate to pay all administrative expenses due or accruing during the period covered by the Budget, exclusive of any fees accrued by professionals.

**B. Insurance Premium Financing**

58. The Debtor needs to have property and liability insurance for the Property. As set forth above, the Debtor obtained binders for property and liability insurance and a premium finance proposal from APF to cover the cost of the insurance. The total cost is $13,958.00, and the amount financed is $9,073.17, payable in seven (7) consecutive monthly payments of $1,333.71, with the first installment payment due September 20, 2010. There also is down payment of $4,884.83 due by September 20th, for a total of $6,217.94 due by September 20th.

59.     As collateral to secure the repayment of the indebtedness due under the Premium Financing Agreement, APF will receive a first priority lien in the policies, including (ii) all money that is or may become due under the Premium Financing Agreement because of a loss under the policies that reduces unearned premiums (subject to the interest of any applicable mortgagee or loss payee); and (ii) any return of premiums or unearned premiums under the policies; and (iii) any dividends that may become due the Debtors in connection with the policies.

60.     Section 364(c) of the Code provides, in pertinent part, as follows: (c) If the [debtor] is unable to obtain unsecured credit allowable under Section 503(b)(l) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt –

> (2) secured by a lien on property of the estate that is not otherwise subject to a lien; (emphasis supplied)

11 U.S.C. § 364(c)(2). A debtor must demonstrate that it cannot obtain credit by means less onerous than granting a lien on property of the estate before the Court will authorize it to obtain credit by giving such a lien. In re Ames Dep't Stores, Inc., 115 B.R. 34, 37 (Bankr. S.D.N.Y. 1990). Once established, the Court must then consider whether the terms of the proposed financing "would tilt the conduct of the bankruptcy case; prejudice, at an early stage, the powers and rights that the Bankruptcy Code confers for the benefit of all creditors; or leverage the Chapter 11 process by preventing motions by parties in interest from being decided on their merits." Ames 115 B.R. 37, at 40-41.

61.     In order to obtain credit, a debtor must demonstrate that (1) it cannot obtain credit unencumbered by super-priority status; (2) the credit transaction is necessary to preserve assets of the estate; and (3) the terms of the agreement are fair, reasonable and adequate. See In re

Crouse Group, 71 B.R. 544 9 Bankr. E.D. Pa. 1987); See e.g. In re Barbara K Enterprises, 08-11474 (MG) (Bankr. S.D.N.Y. 2008).

62. In the present case, as set forth in the Wander Affirmation, the Debtor has no unencumbered assets and no ability to obtain credit unencumbered by super-priority status; the Premium Financing Agreement is necessary to preserve assets of the estate; and the terms of the agreement are fair, reasonable and adequate. Notably, the Premium Finance Agreement is believed to be a standard, type of agreement for this type of transaction and.

63. The Debtor submits that the relief requested is in the best interests of the Debtor and its estate.

*Preliminary and Final Hearings*

64. The Debtor requests that the Court schedule a preliminary hearing and final hearing to consider an interim order and a final order, respectively, pursuant to Bankruptcy Rule 4001.

*Proposed Order*

65. A proposed Interim Order regarding the request for use of cash collateral is annexed as **Exhibit E.**

*Notice*

66. Notice of a preliminary or final hearing shall be given to the (i) U.S. Trustee, (ii) RCF, (iii) all of the Debtor's known creditors, (iv) any entity that files a notice of appearance and (v) any other person who should receive notice pursuant to Bankruptcy Rules 4001(b)(3) and 4001(c)(3), all in accordance with Local Bankruptcy Rule 4001-2(i).

**No Prior Request**

67. No prior motion for the relief requested herein has been made to this or any other

66. Notice of a preliminary or final hearing shall be given to the (i) U.S. Trustee, (ii) RCF, (iii) all of the Debtor's known creditors, (iv) any entity that files a notice of appearance and (v) any other person who should receive notice pursuant to Bankruptcy Rules 4001(b)(3) and 4001(c)(3), all in accordance with Local Bankruptcy Rule 4001-2(i).

**No Prior Request**

67. No prior motion for the relief requested herein has been made to this or any other court.

**WHEREFORE**, the Debtor respectfully requests the entry of an Order granting the relief requested for which no previous request has been made, and that the Court grant such other and further relief it deems just and proper.

Dated: New York, New York
September 16, 2010

DAVIDOFF MALITO & HUTCHER

By: /s/David Wander
David Wander, Esq.
605 Third Avenue, 34th Floor
New York, NY 10158
dhw@dmlegal.com
*Attorneys for Debtor and Debtor in Possession*